UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Case No. 3:24mj00022 |
| | ) |
| DWAYNE THOMAS ROBINSON | ) |
| | ) |

**AFFIDAVIT IN SUPPORT OF**
**A CRIMINAL COMPLAINT**

I, Dylan Leitch, being first duly sworn, hereby depose and state as follows:

### I.   INTRODUCTION

1. This affidavit is submitted in support of a criminal complaint and an arrest warrant charging the defendant, DWAYNE THOMAS ROBINSON ("ROBINSON"), with one count of Hobbs Act Robbery, in violation of Title 18, United States Code, Section 1951, occurring on or about December 15th, 2023 in the Western District of Virginia.

### II.   AFFIANT BACKGROUND

2. I have been a police officer with the Albemarle County Police Department (ACPD) since 2015 and am currently serving as a Police Detective in the Robbery/Homicide division of ACPD's Criminal Investigations Division. I have also been a Safe Streets Task Force Officer (TFO) with the Federal Bureau of Investigation ("FBI") since August of 2023.

3. In 2015, I graduated from the Central Shenandoah Criminal Justice Training Academy in Weyers Cave, Virginia, where I received approximately 18 weeks of classroom instruction and approximately six months of field training. Since graduating from the Academy I

have received further training on state and federal law, including, but not limited to, trainings on state and federal laws concerning armed robberies.

4.      In my role as a Police Detective and FBI TFO, I investigate violations of Virginia and federal laws, including violent crimes, firearm offenses, and armed robberies. As a law enforcement officer, I have conducted many investigations involving the illegal use, possession, and distribution of narcotics and unlawful and possession of firearms. I am familiar with the types of evidence establishing the commission of these crimes through my participation in surveillance operations, executing search warrants, interviewing subjects, witnesses, and confidential sources, as well as other sources.

### III.   SOURCE OF INFORMATION

5.      The facts in this affidavit come from a variety of sources, including my personal knowledge of the facts and circumstances obtained through my participation in this investigation, my training and experience, information obtained from other law enforcement officers/agents, and witnesses, and information provided by records and databases, as well as other sources, which I believe to be reliable. All observations not personally made by me were relayed to me by individuals who made them or are based on my review of reports, documents, law enforcement body-worn camera footage, and other evidence obtained during the investigation. Where I refer to statements and events, I often refer to them in substance and in relevant parts rather than in their entirety or verbatim, unless otherwise noted. This affidavit also reflects my current understanding of facts relating to this investigation, but my understanding may change in the future as the investigation proceeds. Similarly, where information contained in reports and other documents or records are referenced herein, such information is also described in sum and substance and in

relevant part only. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter. Further, my understanding of certain evidence and facts may change as the investigation progresses.

### III.   APPLIABLE LAW

6. Under 18 U.S.C. § 1951, it is unlawful for a person to: (1) obtain property from another without that person's consent; (2) by wrongful use of actual or threatened force, violence, or fear; and (3) as a result of the person's actions, interstate commerce or an item moving in interstate commerce, was actually or potentially delayed, obstructed, or affected in any way or degree.

### IV.   PROBABLE CAUSE

A. **Robbery of Tobacco Store**

7. On or about December 15, 2023, at approximately 10:08 AM, the Albemarle County Police Department (ACPD) responded to a call of an armed robbery at a tobacco store in Charlottesville, Virginia (hereinafter, the "Store"). The Store is located within the Western District of Virginia.

8. ACPD interviewed the store clerk (hereinafter, "V-1") who stated that, at approximately 10:05AM, a black male (later identified as ROBINSON) entered the store wearing a black hooded sweatshirt, multi-colored facemask, and tinted glasses. V-1 stated the perpetrator placed a note on the counter demanding cash and cigarettes and then placed what appeared to be a black revolver firearm on the counter. V-1 stated that he handed the perpetrator approximately $1,000 in cash and approximately nine cartons of Newport cigarettes, which the perpetrator placed into a white plastic bag that he had brought with him.

9. Law enforcement reviewed audio-video security camera footage, which was consistent with V-1's statement. The camera footage showed that the perpetrator was wearing black shoes that had a white stripe on the bottom. After V-1 handed over cartons of cigarettes, the perpetrator is heard on the video tape demanding more. Below is a still image taken from the Store's security camera system.



4

LEITCH AFF. IN SUPPORT OF CRIMINAL COMPL

10. Below is a still image taken from the Store's security camera system. The red arrows added to the image highlight the note and apparent firearm.



B. **Law Enforcement Canvases the Area Around the Robbery**

11. Law enforcement canvased the scene and spoke with an employee at a nearby business (hereinafter, "W-1"). W-1 reported that, around the time of the robbery, W-1 observed a black man behind a pair of large dumpsters in W-1's employer's parking lot. W-1 stated the man was dark-skinned, did not have facial hair, and wore a "du-rag" on his head and carried two packs of Newport cigarettes. W-1 reported that the man claimed he had "had an accident" and was "trying to clean up."

12. An officer searched the area where W-1 reported he/she had seen the man behind the dumpsters and found a black hoodie inserted into a space in the side of the dumpster. Next to the dumpster police found a multi-colored mask and black plastic glasses. Below are photographs depicting where these items were located by police. The location of the black hoodie is highlighted by the red arrow and red circle.





C.     **Law Enforcement Collect Video Surveillance From Another Business**

14.    Law enforcement reviewed video camera footage from a business located approximately 1,100 feet from the Store (hereinafter, "B-1"). The camera footage showed a person

wearing a black hoodie and light-colored gloves walking from east to west towards the Store at approximately 9:42AM. The person wore black shoes with a white stripe on the bottom.

15. Below is a still image taken from B-1's surveillance video showing the suspected perpetrator walking towards the Store.



16. At approximately 10:10am, B-1's surveillance camera footage captured a black man resembling ROBINSON walking from west to east – from the general direction of the Store and to the same area where the person was captured on video at 9:42am walking from. The man was wearing a black "du-rag" style-item and black shoes with a white stripe on the bottom. Below is a still image taken from B-1's surveillance camera at approximately 10:10am.



### D. Police Encounter ROBINSON Near the Crime Scene

17. At approximately 2:00PM, police canvasing the crime scene area stopped a man walking on Putt Putt drive and matched the suspect's physical description. The police stopped the man approximately 2,000 feet from the Store and approximately 1,000 feet from the Mallside Forest Apartments. The man provided officers with identification confirming that he was ROBINSON.

18. At the time he was encountered by officers, ROBINSON was carrying a plastic bag containing several packages of cigarettes, including Newport brand cigarettes. ROBINSON advised that he was returning from Walmart, where he had just purchased the cigarettes.

19. The officers showed ROBINSON a still image taken from B-1's security camera. ROBINSON admitted that he resembled the person in image, but denied that it was him. ROBINSON suggested that it may have been his cousin.

      **E.**      **Witnesses Report ROBINSON Committed the Robbery**

20. On December 16, 2023, law enforcement was called to respond to a disturbance at an apartment in the Mallside Forest Apartments. The Mallside Forest Apartments are located off of Seminole Trail Rd, across from the Store, and in the same general proximity as where ROBINSON was stopped on Putt Putt road on December 15, 2023.

21. Law enforcement contacted the unit's resident and a woman who claimed to have been formerly romantically involved with ROBINSON (hereinafter, "W-2" and "W-3," respectively). W-3 reported that ROBINSON committed the robbery at the Store and used a mask and glasses belonging to W-2 during the commission of the robbery.

22. W-2 advised that he was friends with ROBINSON and ROBINSON spent the evening of December 14, 2023 and the morning of December 15, 2023 at his apartment.[1] W-2 stated he saw a photograph of the suspect who robbed the store.[2] W-2 reported that the suspect was wearing a mask and glasses that appeared to be identical to a mask and glasses that W-2 owned.

23. W-2 reported that he had last seen the mask and glasses when he left his apartment near the front door at approximately 9:30am on December 15, 2023. W-2 noted that he had not seen the mask and glasses upon his return to the unit at approximately 2:00pm that same day.

24. W-2 also reported that W-2 stored a black BB-gun revolver under their pillow, and that ROBINSON knew where they stored it. The black BB-gun appeared to match the firearm that

---

[1] It has come to the government's attention that W-2 has certain unspecified mental disabilities that can have an impact on W-2's ability to recall or perceive events. I believe that the information that W-2 provided to law enforcement was truthful because law enforcement was able to corroborate many of W-2's statements. I also personally spoke to W-2 during the course of the investigation and I found W-2 to be truthful.

[2] Law enforcement publicized a photograph of the suspect on December 15, 2023.

the suspect used during the robbery, as detailed in the two images shown below:

**W-2's BB-Gun**               **The Perpetrator's Gun**

    

25.     W-2 was shown a still image of the suspect taken from B-1's security camera system, but W-2 was unable to identify the person in the photograph. W-2 also advised that his social worker ("W-4") was with ROBINSON on December 15, 2023.

F.      **Witness 4 Reports That They Were With ROBINSON on December 15, 2023 at Between Approximately 11:30am and 12pm**

26.     On or about December 18, 2023, law enforcement interviewed W-4, who reported that she had met ROBINSON at a Walmart on December 15, 2023, between 11:30am and 12pm.

27.     W-4 further advised that she met with ROBINSON and provided him with money to purchase cigarettes in Walmart. W-4 reported that ROBINSON was wearing black sweatpants and a gray tee-shirt.

28.     I reviewed publicly available maps, which show a Walmart located approximately 1.5 miles from the Store. Based on my training and experience, as well as my familiarity with the geographic area, I believe ROBINSON had sufficient time to commit the robbery at approximately 10:05AM and meet W-4 at Walmart between approximately 11:30AM and 12PM.

G. **Witness 3 Reports that ROBINSON Confessed to Robbing the Store**

29. On or about December 18, 2023, W-3 called law enforcement and reported that ROBINSON had confessed to committing the robbery of the Store on December 15, 2023. W-3 reported that they had seen a public report of the robbery and W-3 confronted ROBINSON, who admitted committing the robbery.

30. W-3 also reported that police had stopped ROBINSON later in the day on December 15, 2023 and let him go. It was not public knowledge that police had stopped ROBINSON that day.

H. **Demand Note From Robbery Is Collected**

31. On or about December 18, 2023, an employee from a property management company contacted law enforcement and reported that they had found a handwritten demand note. The employee reported that the note was collected from the publicly accessible trash can in front of the Store.

32. Below is a photograph of the front of the store with a red arrow indicating the trash can that the note was found in/near.



33. Below is a photograph of the note that was collected, which is consistent with V-1's description of the demand note that the perpetrator placed on the counter.



### I. W-5 Identifies ROBINSON as the Man Behind the Dumpster Where the Black Hoodie, Multi-Colored Mask, and Glasses Were Found

34. On or about December 18, 2023, law enforcement spoke with a manager of a business near the Store who reported that he saw a man behind the dumpsters where the black hoodie, multi-colored mask, and glasses were found (hereinafter, "W-5") on December 15, 2023 at or around the time of the robbery.

35. Law enforcement showed W-5 a still image taken from the surveillance system of B-1 showing a black man walking away from the Store at approximately 10:10am on December 15, 2023 (see image on page 9).

36. W-5 stated that the man depicted in the image was the same man W-5 observed behind the dumpsters where the black hoodie, multi-colored mask, and glasses were later found.

**J.**     **ROBINSON's Cell Phone Was Turned Off During Robbery**

37.     Law enforcement obtained a historical cell site search warrant for a telephone number that witnesses reported was primarily used by ROBINSON (hereinafter "ROBINSON's Phone").

38.     The search warrant production showed ROBINSON's Phone in the same general proximity of the Store at approximately 9:34am on December 15, 2023.  Between approximately 9:34am and approximately 12:30pm, ROBINSON's Phone was not transmitting location data to cell towers, which is consistent with ROBINSON's phone being powered off during those hours.

39.     I know from my training and experience that those involved in criminal activity are often aware that law enforcement can track the location of a person's cell phone by obtaining a historical cell site location warrant.  I also know from my training and experience that those involved in criminal activity will often turn off their cell phone or place it into "airplane mode" during the times when they are committing crimes, which stops the phone from transmitting location data to cell site towers.  As a result, the isolated absence of location data during key times when a crime was committed can be probative of an individual's involvement.

40.     Here, I believe that ROBINSON likely turned off his cell phone or placed it into airplane mode during the three-hour window when the robbery of the Store was committed to prevent law enforcement from identifying evidence linking him to the crime.

**K.**     **ROBINSON Confesses to Robbing the Store**

41.     On or about January 12, 2024, law enforcement obtained an arrest warrant for ROBINSON for violations of Virginia law related to the robbery of the Store. On or about January 26, 2024, law enforcement arrested ROBINSON and took him into custody.  ROBINSON had a

black BB-gun resembling a Glock pistol on his person when he was taken into custody.[3]

42. Law enforcement read ROBINSON his rights pursuant to *Miranda* and he agreed to speak with investigators. After initially denying any involvement in the crime, ROBINSON subsequently confessed to robbing the Store on December 15, 2023.

43. ROBINSON stated that, on December 15, 2023, he awoke in W-2's apartment, took the BB-gun that resembled a real gun from under W-2's pillow, and used it to rob the Store. Law enforcement showed ROBINSON a photograph of the demand note collected from the scene, which ROBINSON admitted he had written and used during the robbery.[4]

44. ROBINSON stated that employees at a nearby business witnessed him when he was behind a set of dumpsters after he had committed the crime. ROBINSON stated that he told the employees that he had "had an accident" – which is consistent with what W-1 reported to law enforcement.

45. The witness reports about seeing a man behind the dumpsters had never been disclosed to ROBINSON or the public, which, based on my training and experience, makes ROBINSON's confession more trustworthy.

46. ROBINSON subsequently appeared before a Virginia Magistrate on his then-outstanding arrest warrants. During his appearance ROBINSON accepted responsibility and apologized for robbing the Store.

L. **Additional Information**

47. V-1 stated to law enforcement that he did not give ROBINSON consent to take the cash and cigarettes from the Store, and that they only provided the cash and cigarettes to

---

[3] This BB-gun was different from W-3's BB-gun.
[4] ROBINSON stated that he only took $300 from the Store and denied taking cigarettes.

ROBINSON because of ROBINSON's threated force, violence, or fear. V-1 also stated that the Store sells several items that are made, produced, or shipped through interstate commerce. Therefore, the money and the cigarettes taken from the Store were affected interstate commerce.

48. I have reviewed ROBINSON's criminal history, which includes eight felony convictions.

## V.  CONCLUSION

49. Based on the aforementioned, I submit there is probable cause to believe that, on or about December 15, 2023 in the Western District of Virginia, DWAYNE THOMAS ROBINSON, obtained property from another without that person's consent, by wrongful use of threatened force, violence, or fear, and as a result of the ROBINSON's actions, interstate commerce, or an item moving in interstate commerce, was actually or potentially delayed, obstructed, or affected in any way or degree, all in violation of 18 U.S.C. § 1951.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

*s/Dylan Leitch*
DYLAN LEITCH,
Task Force Officer
Federal Bureau of Investigation

Received by reliable electronic means
and sworn and attested to by telephone
on this  8th  day of April 2024.

_____
JOEL C. HOPPE
United States Magistrate Judge